UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

DIANA RIVERA,

                           Plaintiff,

           v.

CAROLYN W. COLVIN
*Acting Commissioner, Social Security*
*Administration*,

                         Defendant.

                                                      **<u>MEMORANDUM & ORDER</u>**
                                                         15-CV-0837 (MKB)

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Plaintiff Diana Rivera filed the above-captioned action seeking review pursuant to

42 U.S.C. § 405(g) of a final administrative decision of the Commissioner of Social Security (the

"Commissioner") denying her claim for Social Security Disability Insurance benefits.  The

Commissioner moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules

of Civil Procedure, claiming that the decision of Administrative Law Judge Mark Hecht (the

"ALJ") is supported by substantial evidence and should be affirmed.  (Comm'r Not. of Mot. for

J. on Pleadings, Docket Entry No. 15; Comm'r Mem. in Support of Mot. for J. on the Pleadings

("Comm'r Mem."), Docket Entry No. 16.)  Plaintiff cross-moves for judgment on the pleadings,

arguing that the ALJ (1) failed to accord appropriate weight to the opinion of Plaintiff's treating

physicians, Dr. Stella Zavelyuk, M.D. and Dr. Isaac Kreizman, M.D., (2) improperly relied on

the opinion of the consulting physician for his assessment of Plaintiff's residual functional

capacity ("RFC"), and (3) improperly assessed Plaintiff's credibility.  (Pl. Cross-Mot. for J. on

Pleadings, Docket Entry No. 17; Pl. Mem. in Support of Cross-Mot. for J. on the Pleadings

("Pl. Mem."), Docket Entry No. 18.)  For the reasons set forth below, the Commissioner's

motion for judgment on the pleadings is denied and Plaintiff's cross-motion for judgment on the pleadings is granted.

## I. Background

Plaintiff is a thirty-four year old woman who has a general educational diploma. (R. 40, 110, 133.) Plaintiff last worked in June 2010 as a maintenance worker at an education facility.[1] (R. 41, 134, 151.) On February 6, 2012, Plaintiff applied for disability insurance benefits, alleging a disability since December 2, 2011, due to back pain, a herniated disc and a lumbar spine impairment. (R. 33, 110–11.) Plaintiff's application was denied. (R. 54–60, 72.) Plaintiff requested a hearing, which was held on May 14, 2013. (R. 36–53.) By decision dated June 3, 2013, the ALJ found that Plaintiff was not disabled and denied Plaintiff's application. (R. 23–35.) On December 19, 2014, the Appeals Council denied review of the ALJ's decision. (R. 1–5.)

### a. Plaintiff's testimony

During the May 14, 2013 administrative hearing, Plaintiff testified that she initially injured her back in a car accident in 2006, but was able to continue working until 2010, although she experienced occasional pain. (R. 43.) Plaintiff became disabled in December 2011, when she was putting bags on the floor and her back "went out." (R. 43.) She could not feel her right leg and she fell. (R. 43.) Since that event, Plaintiff has experienced "stabbing pain" in her back, which radiates down her right leg. (R. 45, 49.) Plaintiff has obtained "minimal relief" from physical therapy and injections. (R. 44.) She takes Tramadol, which relaxes her muscles but does not minimize sciatica or nerve pain. (R. 49.)

---

[1] Plaintiff has alternatively reported that she stopped working due to being unjustifiably fired, (R. 42), and due to her physical impairments, (R. 133).

According to Plaintiff, her muscle spasms have decreased, but sciatica and pain down her right leg still affect her daily life, and some days are worse than others.  (R. 45.)  Plaintiff can sit for fifteen minutes, after which she needs to get up and move her legs for fifteen minutes because she experiences back pain and her "legs start to go numb."  (R. 50.)  Plaintiff can stand for fifteen or twenty minutes, and often leans on something to make herself more comfortable and to relieve the pain.  (R. 50–51.)  Plaintiff needs to lie down three to five times during the day for fifteen to twenty minutes to manage her back pain.  (R. 51.)  On her worst days, Plaintiff can perform only a "very minimum" of her daily activities, such as "wash[ing] a couple dishes" or "try[ing] to sweep."  (R. 46.)  Plaintiff believes she could "eventually" perform a sedentary job in the future as her "condition improves."  (R. 46–48.)

Plaintiff cares for her three children, who, at the time of the hearing, were thirteen, six and five years old.  (R. 45.)   She takes her children to school, returns home, and attends physical therapy.  (R. 45.)  Plaintiff has difficulty doing household chores such as cooking and cleaning, and requires the assistance of her mother, who lives with her, and her oldest son to complete those tasks.  (R. 45, 49–50.)  She can shop for groceries if she has help with lifting larger objects and carrying bags.  (R. 49–50.)

**b.  Plaintiff's work history**

Plaintiff last worked in 2010 as a maintenance worker and she collected unemployment benefits until 2012.  (R. 40–42.)  Before becoming a maintenance worker, Plaintiff worked as a pharmacy technician on and off from 2001 to 2007.  (R. 40–41.)  In June of 2011, Plaintiff completed specialized training as a pharmacy technician.  (R. 134, 41.)

### c. Medical evidence

### i. Ocean Medical, P.C.

From December of 2011 through at least April of 2013, Plaintiff met with healthcare personnel at Ocean Medical, P.C. ("Ocean Medical"). Plaintiff first visited Dr. Zavelyuk at Ocean Medical on December 5, 2011.[2] (R. 177, 189.) The Ocean Medical records also show that Plaintiff visited Ocean Medical for regular appointments in 2012 and 2013, for symptoms unrelated to her back pain, including sinusitis and asthma.[3]

### 1. December 8, 2011 MRI results

Plaintiff's records from Ocean Medical include test results from a December 8, 2011 lumbar spine MRI.[4] (R. 212–213.) The MRI revealed: posterolateral disc herniation at L4-L5, impinging upon the thecal sac; posterolateral disc herniation at L5-S1, impinging upon the thecal sac; and straightening of the normal curvature of the lumbosacral spine.[5] (R. 212–213.)

---

[2] Although records from Ocean Medical reference December 5, 2011 as the start of treatment, no records document an appointment on that date.

[3] Dr. Zavelyuk's notes from January 3, 2012 indicate that Plaintiff presented that day with symptoms of headache, nose congestion, cough and sinus pain, and the doctor reported that Plaintiff had sinusitis. (R. 288.) Plaintiff made further visits to Ocean Medical on November 7 and 10, 2012, for wheezing and asthma, and on November 19, 2012 and December 7, 2012 for a sore throat and related symptoms. (R. 290 – 91.) Plaintiff also visited Ocean Medical on January 23, 2013, March 19, 2013 and April 2, 2013. (R. 285–287.)

[4] The MRI was a result of a referral by Dr. Zavelyuk to Dr. Harold S. Parnes, M.D., at MEGA Diagnostic Imaging. (R. 212.)

[5] The Ocean Medical records also include the results of blood testing performed on December 16, 2011. (R. 209.) The report states that Plaintiff was negative for HLA-B27, which can indicate that a carrier has ankylosing spondylitis, reactive arthritis, or psoriatic arthritis. (R. 209.)

## 2. Dr. Stella Zavelyuk

In a letter dated December 29, 2011, Dr. Zavelyuk opined that Plaintiff was "unable to work for the next twelve months due to limping, leg pain and lower back pain." (R. 300.) Dr. Zavelyuk referenced the December 8, 2011 MRI noting that "[Plaintiff's] MRI showed a posterocentral disc herniation at L5-SA" with "ventral impingement on the thecal sac." (R. 300.)

Dr. Zavelyuk completed a Multiple Impairment Questionnaire dated February 6, 2011.[6] (R. 189–196.) She diagnosed disc herniation and impingement of the thecal sac, causing Plaintiff an "enormous amount of pain." (R. 189.) She stated that with physical therapy, Plaintiff might improve within six months. (R. 189.) Dr. Zavelyuk identified clinical findings of severe back pain radiating to the right leg, numbness and limping. (R. 189.) She cited an MRI in support of her findings and diagnosis, although she did not specifically identify the MRI, which showed herniation at L4-L5 and impingement of the thecal sac. (R. 190.) Dr. Zavelyuk identified Plaintiff's primary symptoms as back pain in the lumbar area and numbness. (R. 190.) She characterized Plaintiff's pain and fatigue as moderate, rating them a six and a five, respectively, on a ten-point scale. (R. 191.) Dr. Zavelyuk stated that Plaintiff's pain was precipitated by body movement and the lifting of objects weighing over three pounds. (R. 191.)

Dr. Zavelyuk observed that during an eight-hour workday, Plaintiff could sit for one hour and stand or walk for one hour, and that Plaintiff needed to get up and move around every hour. (R. 191.) Plaintiff could occasionally lift up to five pounds, but could not carry any weight. (R. 192.) Dr. Zavelyuk stated that the act of reaching exacerbated Plaintiff's back pain, although

---

[6] Although the questionnaire is dated February 6, 2011, the year appears to be erroneous, as elsewhere Dr. Zavelyuk states that she began treating Plaintiff on December 5, 2011, and that, at the time of the questionnaire, the date of the most recent patient exam was February 4, 2012. (R. 189.)

Plaintiff had no limitations of the use of her arms and hands for reaching, including overhead reaching. (R. 192–93.) Dr. Zavelyuk stated that Plaintiff could not push, pull, kneel or bend. (R. 195.) At the time when Dr. Zavelyuk completed the questionnaire, Plaintiff was taking Motrin and Naproxen, which were not relieving her pain. (R. 193.) Dr. Zavelyuk noted that after Plaintiff began physical therapy, the pain slightly improved. (R. 193.) The doctor stated that Plaintiff's symptoms would increase if she worked, and that the pain would periodically interfere with Plaintiff's concentration. (R. 193–94.) Dr. Zavelyuk estimated that Plaintiff would need to rest at unpredictable intervals as frequently as every hour, for periods of rest lasting up to a few hours at a time. (R. 194.) Dr. Zavelyuk also estimated that Plaintiff would likely be absent from work more than three times per month as a result of her impairment. (R. 195.)

Dr. Zavelyuk completed a second questionnaire, dated February 28, 2012. (R. 177–87.) In the second questionnaire, Dr. Zavelyuk indicated that she had last examined Plaintiff on February 4, 2012. (R. 177.) Dr. Zavelyuk diagnosed right-sided disc herniation with impingement of the thecal sac, and stated that she expected Plaintiff's condition to last for six months. (R. 177–78.) She stated that Plaintiff's primary symptom was back pain, which occurred a few times per week and lasted for two hours during each occurrence and was exacerbated by Plaintiff walking or lifting her children. (R. 177, 183.) She reported clinical findings underpinning her diagnosis of muscle spasms in the lower back and sciatic pain, and identified diagnostic testing including the December 8, 2011 MRI. (R. 178–79.) Dr. Zavelyuk reported that Plaintiff was able to tandem walk unaided and walk on her toes, but was unable to walk on her heels or rise from a squatting position. (R. 180.) Plaintiff had normal gross and fine

manipulation in her hands. (R. 181.) Plaintiff could flex her lumbar spine up to forty degrees out of ninety, and could flex laterally to the right to twenty degrees out of twenty-five. (R. 187.)

Dr. Zavelyuk reported that Plaintiff was receiving physical therapy three times a week and that Plaintiff's medications were not providing complete pain relief, but that her pain was "slightly better." (R. 178, 182.) The doctor reported that while Plaintiff previously walked with a waddling gait, that was no longer the case. (R. 180.) Dr. Zavelyuk opined that Plaintiff could lift and carry up to two pounds and was only able to stand or walk for periods of up to two hours. (R. 184.) She reported Plaintiff's ability to remain in a seated position was limited as well, but did not specify to what extent. (R. 184.)

### ii. Pain and Rehabilitation Services

Beginning on December 13, 2011, Plaintiff visited Pain and Rehabilitation Services ("PARS"), where she was treated by Dr. Isaac Kreizman, M.D., a rehabilitation specialist, and sought physical therapy related to her back pain. (R. 238.) PARS records also show that a lumbar MRI was performed on Plaintiff on March 5, 2013. (R. 277.)

### 1. Dr. Isaac Kreizman

PARS records include comments signed by Dr. Kreizman regarding Plaintiff's December 13, 2011 visit to PARS, where she complained of "low back" pain that rated as seven on a scale of ten. (R. 238.) Plaintiff complained of numbness on the right side and in her right leg and of a gait disorder. (R. 238.) On examination, Dr. Kreizman determined that Plaintiff had positive sacroiliac joint tenderness, four out of five muscle strength in the right leg, and three out of five muscle strength in the left leg. (R. 240.) He indicated that her gait was normal. (R. 240.) Dr. Kreizman diagnosed sacroiliac joint pain and gait disorder, administered corticosteroid injections in the bilateral sacroiliac joints, and prescribed physical therapy. (R. 241–42.)

On December 16, 2011, Dr. Kreizman conducted an initial physical therapy evaluation of Plaintiff. (R. 270.) Plaintiff complained of lower back pain, radiating to her right lower extremity. (R. 271.) She reported difficulty walking three blocks, sitting or standing for more than ten minutes at a time, bending, squatting, and performing activities of daily living. (R. 271.) On examining Plaintiff, Dr. Kreizman noted tenderness, spasm, tightness, weakness, and limited range of motion. (R. 271–72.) Plaintiff's straight leg raising was "positive" at eighty-five degrees, and she had lumbar ranges of motion of flexion and extension to thirty degrees and side flexion/rotation to thirty-five degrees. (R. 272.) Dr. Kreizman diagnosed lumbar radiculopathy, "low back" pain, and sacroiliac joint pain and prescribed physical therapy to improve Plaintiff's pain, range of motion, and strength. (R. 271–72.) Plaintiff later received physical therapy at PARS.[7]

On January 25, 2012, Dr. Kreizman treated Plaintiff with bilateral sacroiliac joints corticosteroid injections. (R. 233, 37.) At that appointment, Plaintiff reported her "low back" pain as a seven out of ten and a gait disturbance. (R. 234.) After examining Plaintiff, Dr. Kreizman noted abnormal findings in the "low back" and lower extremities and diagnosed

_____

[7] Plaintiff received physical therapy at PARS on December 23 and 27, 2011. (R. 268–69.) The PARS records indicate Plaintiff also attended physical therapy on January 2, 20, 27, and 31, 2012 and on February 2, 10, 14, and 17, 2012. (R. 260–67.) On January 20, 2012, the therapist reported that Plaintiff was able to walk five blocks. (R. 266.) On January 27, 2012, Plaintiff reported her back pain to be an intensity of four on a scale of ten. (R. 265.) On January 31, 2012, Plaintiff stated that she was able to get out of bed and put on her shoes. (R. 264.) On February 10, 2012, a physical therapist reported that Plaintiff was able to sit for 20 to 25 minutes at a time. (R. 261.) On February 14, 2012, a physical therapist noted that Plaintiff's ambulation had increased to seven blocks, and her lower back pain was moderate. (R. 261.) The PARS records also indicate that, after a six month absence, Plaintiff attended physical therapy on August 3, 8, 9, 14, 16, 21, and 23, 2012 and again on September 6, 2012. (R. 249–58.) On August 14, 2012, Plaintiff reported that it had become easier for her to get in and out of bed and dress herself. (R. 255.) On August 16, 2012, Plaintiff was able to stand for twenty minutes. (R. 254.) Plaintiff returned to physical therapy on March 20, 25, and 28, 2013. (R. 243–45.) On March 28, 2013, Plaintiff reported less pain while sleeping and bending. (R. 243.)

sacroiliac joint pain, gait disorder, and sacroiliitis. (R. 235–36.) On July 17, 2012, Plaintiff returned to Dr. Kreizman and complained of ongoing "low back" pain, rating seven on a scale of ten and intermittently radiating into the legs, and she complaint of weakness and loss of range of motion. (R. 228–32.) Dr. Kreizman's examination of Plaintiff revealed positive sacroiliac joint tenderness, (R. 230), and he administered additional bilateral sacroiliac joints corticosteroid injections, (R. 232).

Plaintiff had another appointment with Dr. Kreizman on September 11, 2012. (R. 224.) She complained of "low back" pain at a seven on a scale of ten, intermittently radiating into the legs, and also complained of weakness, loss of range of motion, and leg numbness. (R. 224, 227.) Plaintiff reported difficulty walking and lying down. (R. 227.) Dr. Kreizman noted that his examination of Plaintiff revealed positive sacroiliac joint tenderness. (R. 225.) Dr. Kreizman diagnosed lumbar radiculopathy, "low back" pain, and gait disorder. (R. 226.) Plaintiff returned to Dr. Kreizman on March 5, 2013, and reported ongoing "low back" pain, rating an eight on a scale of ten, and difficulty walking due to back pain. (R. 220.) Dr. Kreizman noted that Plaintiff had positive sacroiliac joint tenderness, decreased lumbar range of motion, and an antalgic gait. (R. 222.) Dr. Kreizman diagnosed lumbar radiculopathy, "low back" pain, and gait disorder. (R. 220, 223.)

On March 7, 2013, Dr. Kreizman wrote a letter, addressed "[t]o whom it may concern," in which he stated he had been treating Plaintiff for severe back pain, lumbar radiculopathy, gait disorder, herniated discs, and straightening of the normal lumbar spine curve. (R. 215.) He stated that Plaintiff had difficulty walking, standing, and sitting for long periods. (R. 215.) Dr. Kreizman reported that Plaintiff was receiving treatment for her condition, including physical therapy and regular injections, and was taking Tramadol to reduce her pain and increase her

range of motion and muscle strength.  (R. 215.)  Dr. Kreizman described Plaintiff as having

decreased muscle strength and range of motion, and as experiencing limitations in activities of

daily living.  (R. 215.)  He stated that she had been unable to work for the past twelve months

due to the pain, and opined that she was unable to perform any type of physical activity or work

for the next twelve months, and that, unless she refrained from such activity and work, her

condition might worsen.  (R. 215.)  Dr. Kreizman also performed a nerve conduction study on

Plaintiff.  (R. 273.)  He reported that the results revealed evidence of bilateral L5 radiculopathy.

(R. 276.)

On March 19, 2013, Plaintiff had another appointment with Dr. Kreizman and she

complained of pain when walking, sitting, and standing, and rated her pain as a seven on a scale

of ten.  (R. 216.)  Dr. Kreizman diagnosed Plaintiff with lumbar radiculopathy, "low back" pain,

left sacroilitis, and gait disorder, and stated that Plaintiff was improving with "physical

medicine" treatment.  (R. 219.)

### 2.    March 5, 2013 MRI

PARS records show that a lumbar MRI was performed on Plaintiff on March 5, 2013.

(R. 277.)  The results revealed a moderate broad-based disc herniation at L4-L5 and a mild disc

herniation at L5-S1, and no spondylolisthesis or focal mass lesion.  (R. 277.)  An ultrasound of

Plaintiff's lower extremities, performed on the same day, revealed no evidence of deep vein

thrombosis, and normal blood flow in the veins of both legs.  (R. 278.)

### iii.   Dr. Chaim Shtock, consultative examiner

On March 2, 2012, Dr. Chaim Shtock, D.O., examined Plaintiff at the request of the

Social Security Administration.  (R. 197–200.)  Plaintiff described her history of lower back pain

beginning on December 2, 2011.  (R. 197.)  She reported going to the emergency room the next

day, where she was given a Tramadol injection. (R. 197.) Plaintiff reported that her primary

doctor had referred her for a lower back MRI. (R. 197.) Dr. Shtock noted that, according to

Plaintiff, the MRI revealed disc herniation.[8] (R. 197.) Dr. Shtock noted that Plaintiff described

treatment by her pain management doctor, who prescribed Ultracet and administered trigger

point injections, and that Plaintiff obtained temporary relief from physical therapy. (R. 197.)

Plaintiff described her back pain as an eight out of ten and as daily, constant and dull,

occasionally becoming sharp and stabbing.[9] (R. 197.) She stated that her back pain was

accompanied by numbness in her right thigh and was aggravated by prolonged sitting, standing,

walking and bending. (R. 197.) Plaintiff stated that her mother and twelve-year-old son help

with cooking, cleaning, shopping and washing laundry. (R. 198.) She described being able to

maintain independence in her personal care, including showering and dressing. (R. 198.)

Plaintiff was wearing a back brace, but was examined without it. (R. 199.)

On examination, Dr. Shtock noted that Plaintiff appeared to be in no acute distress,

ambulated with a normal gait, and had no difficulty walking on her heels and toes. (R. 198.)

Plaintiff was unable to squat beyond thirty percent of the maximum range of motion, as she was

limited by her back pain. (R. 198.) Plaintiff needed no help getting on and off the examination

table, and was able to rise from a chair without difficulty. (R. 199.) Her hand and finger

dexterities were intact, and she had full ("5/5") grip strength. (R. 199.) Plaintiff's cervical spine,

shoulders, elbows, forearms, wrists, knees, and left hip exhibited full ranges of motion. (R. 199.)

In the upper and lower extremities, Plaintiff had full ("5/5") strength and physiologic and equal

---

[8] Dr. Shtock did not indicate whether he had reviewed the MRI results. (R. 197.)

[9] Plaintiff also reported a history of right knee pain since 1997 and she advised Dr. Shtock that she had undergone arthroscopic knee surgery in December of 2001. (R. 197.)

reflexes.  (R. 199.)  Plaintiff had no muscle atrophy, sensory abnormalities, or instability.

(R. 199.)  The ranges of motion for Plaintiff's lumbar spine were: flexion to sixty degrees;

extension to zero degrees limited by pain; and lateral flexion and rotary movement to twenty

degrees limited by pain.  (R. 199.)  Dr. Shtock noted bilateral lumbar paraspinal tenderness.

(R. 199.)  Plaintiff had no sciatic notch tenderness, trigger points, or muscle spasm.  (R. 199.)

Dr. Shtock noted that Plaintiff's straight leg raising was positive on the right to thirty degrees,

but negative on the left side, and her right hip flexion was to ninety degrees due to lower back

pain.  (R. 199.)

Dr. Shtock diagnosed Plaintiff with lower back pain, a reported history of allergic

bronchitis, and a reported history of psoriasis.  (R. 199.)  He opined that Plaintiff was

"moderately" limited in her ability to engage in: frequent stair climbing; squatting; heavy lifting;

walking long distance; standing "long periods;" sitting for "long periods;" and frequent bending.

(R. 200.)  He concluded that Plaintiff was not limited in using both arms for overhead activities

or in using her hands for fine or gross manual activities, and that she had no other physical

functional limitation.  (R. 200.)

### d.  Additional evidence

#### i.  Function and pain questionnaire

On March 6, 2012, Plaintiff completed a function and pain questionnaire as part of her

application for disability insurance benefits.  (R. 139–150.)  Plaintiff recounted that her back had

first "gone out" in 2006, and that the pain became much worse on December 2, 2011, when she

bent over to pick up a bag from the floor.  (R. 147.) Plaintiff reported sciatica, severe muscle

spasms, and pain in her lower back and right leg.  (R. 140, 145, 148.)  Plaintiff stated that she

was always in "some kind of pain."  (R. 140.)  Plaintiff reported treatment by Dr. Kreizman, who

prescribed Ultracet and a back brace to be worn three hours per day and especially when sitting. (R. 146, 147–49.) Plaintiff reported that she attended physical therapy two times per week, and that medication lessened her back pain but did not eliminate it. (R. 148–49.)

Plaintiff reported that her pain, sciatica, and muscle spasms made it difficult to sleep, and that sometimes she could not move. (R. 140.) She experienced pain in her back and down the right leg when she attempted to bend, stretch, walk distances, sit, kneel, squat, reach high up, lift, carry, push, pull, dress, shower, brush her hair, or shave her legs. (R. 140–41, 145, 148.) Plaintiff was able to stand, walk, and sit for up to ten to fifteen minutes before experiencing pain. (R. 144–45.) She was also able to walk up to three blocks before needing to stop for five to fifteen minutes. (R. 146.)

Plaintiff explained that with her mother's help she cared for her children, which included taking them to and from school, bathing them, cooking simple meals, and helping with homework. (R. 140.) Plaintiff's mother assisted with household chores, such as cleaning, laundry, ironing, mopping, and sweeping, and Plaintiff's mother also usually cooked, although Plaintiff was able to cook quick meals. (R. 141–42.) Plaintiff stated that she was able to bathe and dress herself, albeit with some pain. (R. 140.) Plaintiff was able to walk, drive a car, and use public transportation. (R. 142–43.) She shopped for groceries, sometimes with the assistance of her twelve-year-old son. (R. 143.)

     **e.**    **The ALJ's June 3, 2013 decision**

The ALJ conducted the five-step sequential analysis as required by the Social Security Administration under the authority of the Social Security Act (the "SSA"). First, the ALJ found that Plaintiff had not engaged in substantial activity since December 2, 2011, the alleged onset date. (R. 28.) Second, the ALJ found that Plaintiff had a severe impairment of "lower back pain,

disc herniations at L4-L5 and L5-S1." (R. 28.) Third, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or is equal to the severity of one of the impairments listed in Appendix 1 of the Social Security Regulations. (R. 28.) The ALJ considered Listing 1.04 A, which pertains to disorders of the spine, and based his determination on the "treatment record and the consultative examination." (R. 28.)

Next, the ALJ determined that Plaintiff "has the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a)." (R. 31.) The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected" to cause Plaintiff's symptoms, but found that Plaintiff's statements concerning the "intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained." (R. 31.) The ALJ "emphasize[d] that although some functional restrictions could be expected" as a result of Plaintiff's back condition, the restrictions were "clearly not as severe as she . . . alleged." (R. 31.) The ALJ found that the "medical record established" that the conditions asserted by Plaintiff "were not as severe as she sustains." (R. 29.) The ALJ further noted that in the function and pain questionnaire completed by Plaintiff, she indicated she was able to cook, bathe, and dress independently, with some pain, and that she "was able to drive a motor vehicle, take public transportation, and walk in order to get to appointments or run errands." (R. 31.)

In reaching this conclusion, the ALJ accorded the opinions of the state physical consultative orthopedist, Dr. Shtock, "great weight" because he "examined [Plaintiff] personally" and his "findings were consistent with the examination performed." (R. 31.) Dr. Shtock diagnosed Plaintiff with lower back pain and opined that Plaintiff had "moderate" limitations with frequent stair climbing, squatting, heaving lifting, walking long distances, and standing or sitting for long periods, and with frequent bending. (R. 31.)

The ALJ accorded "little weight" to the opinion of Dr. Zavelyuk, who had opined that Plaintiff was severely restricted and could only stand and walk for less than two of the hours in an eight-hour work day, "because she did not demonstrate what specific clinical findings or objective medical tests supported her conclusions" and because "her treatment record did not include any clinical findings supporting her opinion." (R. 30.) The ALJ stated that Dr. Zavelyuk, who also reported that Plaintiff's capacity to sit for an extended period of time was limited, "did not quantify what amount of time" Plaintiff could sit, (R. 30), and "did not make a single clinical finding" with respect to Plaintiff's back conditions, (R. 29). The ALJ accorded "some weight" to the opinion of Dr. Kreizman, who diagnosed Plaintiff with severe "low back" pain, lumbar radiculopathy, a gait disorder, disc herniations, and straightening of the lumbosacral spine. (R. 30.) The ALJ found that, although Dr. Kreitzman treated Plaintiff "regularly, he did not quantify specific functional restrictions" with respect to her "capacity to sit, stand or walk" as a result of her medical conditions. (R. 30.)

Finally, the ALJ determined that Plaintiff was not capable of performing her prior relevant work as a pharmacy technician and a maintenance worker, because those jobs required tasks that exceeded the RFC assessed by the ALJ. (R. 31.) The ALJ concluded that, given Plaintiff's age, education and work experience, jobs in the national economy that Plaintiff can perform existed in significant numbers. (R. 32.) The ALJ further found that Plaintiff was not disabled given the RFC for "the full range of sedentary work." (R. 32.) Therefore, the ALJ determined that, during the period from December 2, 2011 to the date of the decision, Plaintiff was not suffering from a "disability" as this term is defined under the SSA. (R. 32.)

## II.  Discussion

### a.  Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam).  "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same).  Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted).  In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").  The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted).  If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner.  *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'"

*McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008)

(alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### b. Availability of benefits

Federal disability insurance benefits are available to individuals who are "disabled"

within the meaning of the Social Security Act.  To be eligible for disability benefits under the

Act, the plaintiff must establish his or her inability "to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be of "such severity that he is

not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national

economy."  *Id.* § 423(d)(2)(A).  The Commissioner has promulgated a five-step analysis for

evaluating disability claims.  20 C.F.R. § 404.1520.  The Second Circuit has described the steps

as follows:

> The first step of this process requires the [Commissioner] to
> determine whether the claimant is presently employed.  If the
> claimant is not employed, the [Commissioner] then determines
> whether the claimant has a "severe impairment" that limits her
> capacity to work.  If the claimant has such an impairment, the
> [Commissioner] next considers whether the claimant has an
> impairment that is listed in Appendix 1 of the regulations.  When
> the claimant has such an impairment, the [Commissioner] will find
> the claimant disabled.  However, if the claimant does not have a
> listed impairment, the [Commissioner] must determine, under the
> fourth step, whether the claimant possesses the residual functional
> capacity to perform her past relevant work.  Finally, if the claimant
> is unable to perform her past relevant work, the [Commissioner]
> determines whether the claimant is capable of performing any other
> work.  If the claimant satisfies her burden of proving the
> requirements in the first four steps, the burden then shifts to the
> [Commissioner] to prove in the fifth step that the claimant is capable
> of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential evaluation for adjudication of disability claims, set forth at 20 C.F.R. § 404.1520").

### c.   Analysis

The Commissioner moves for judgment on the pleadings, arguing that (1) substantial evidence supported the ALJ's determination, (2) the ALJ correctly evaluated the medical evidence and made a determination as to Plaintiff's credibility, and (3) the evidence submitted by Plaintiff to the Appeals Council would not have altered the ALJ's determination. (Comm'r Mem. 15–24.) Plaintiff cross-moves for judgment on the pleadings, arguing that the ALJ (1) failed to accord Plaintiff's treating physicians, Dr. Zavelyuk and Dr. Kreizman, appropriate weight, (2) improperly relied on the opinion of the consulting doctor in his assessment of Plaintiff's RFC, and (3) did not properly evaluate Plaintiff's credibility. (Pl. Mem. 7–15.)

### i.   Treating physician rule and the duty to develop the record

Plaintiff argues that the ALJ erred in according reduced weight to the opinions of treating physicians Dr. Zavelyuk and Dr. Kreizman, even though their opinions were supported by corroborating evidence and were not contradicted by substantial evidence in the record. (Pl. Mem. 7–11.) Plaintiff further argues that the ALJ failed to develop the record regarding support for the opinions of Dr. Zavelyuk and Dr. Kreizman, particularly with respect to the ALJ's determination that Dr. Kreizman failed to quantify his findings regarding Plaintiff's functional capacities. (*Id.* at 11.) The Commissioner argues that the ALJ properly discounted the opinions of Dr. Zavelyuk and Dr. Kreizman because Dr. Zavelyuk's opinion lacked evidentiary support and Dr. Kreizman's opinion was insufficiently quantified. (Comm'r Mem. 17–18.)

"[A] treating physician's statement that the claimant is disabled cannot itself be determinative." *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (same). But a treating physician's opinion as to the "nature and severity" of a plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record."[10] 20 C.F.R. § 404.1527(c)(2); *see Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

An ALJ must consider a number of factors to determine how much weight to assign a treating physician's opinion, specifically: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2) and discussing the factors). The ALJ must set forth the reasons for the weight assigned to the treating physician's opinion. *Halloran*, 362 F.3d at 32. While the ALJ is not required to

---

[10] A treating source is defined as a plaintiff's "own physician, psychologist, or other acceptable medical source" who has provided plaintiff "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 404.1502; *see also Bailey v. Astrue*, 815 F. Supp. 2d 590, 597 (E.D.N.Y. 2011).

explicitly discuss the factors, it must be clear from the decision that the proper analysis was undertaken. *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)). Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d at 32–33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians['] opinion . . . .").

However, before evaluating the weight assigned to a treating physician, the Court must assess whether the ALJ satisfied his threshold duty to adequately develop the record before deciding the appropriate weight to afford to a treating physician's opinion.[11] *Burgess*, 537 F.3d at 129 ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999))); *Collins v. Comm'r of Soc. Sec.*, No. 11-CV-5023, 2013 WL 1193067, at *9–10 (E.D.N.Y. March 22, 2013) (remanding for failure to develop the record); *Pabon v. Barnhart*, 273 F. Supp. 2d 506, 514 (S.D.N.Y. 2003) ("[T]he duty to develop a full record . . . compels the ALJ . . . to obtain from the treating source expert opinions as to the nature and severity of the claimed disability . . . . Until he satisfies this threshold requirement, the ALJ cannot even begin

---

[11] The ALJ is "under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel." *Petrie v. Astrue*, 412 F. App'x 401, 406 (2d Cir. 2011) (summary order); *see also Johnson v. Astrue*, 811 F. Supp. 2d 618, 629 (E.D.N.Y. 2011) (citing *Rosa*, 168 F.3d at 79, and *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).

to discharge his duties . . . under the treating physician rule." (alterations in original) (quoting *Peed v. Sullivan*, 78 F. Supp. 1241, 1246 (E.D.N.Y. 1991))).

In *Selian*, the consultative examiner's opinion, on which the ALJ relied, concluded that the claimant could lift objects "of a mild degree of weight on an intermittent basis." *Id.* at 421. The Second Circuit found this opinion "remarkably vague," and, as a result, the ALJ's analysis amounted to "sheer speculation." *Id.* Given the claimant's testimony to the contrary, "[a]t a minimum, the ALJ likely should have contacted [the physician] and sought clarification of his report." *Id.* (citing 20 C.F.R. § 404.1520b(c)(1)); *McClinton v. Colvin*, No. 13-CV-8904, 2015 WL 5157029, at *23 (S.D.N.Y. Sept. 2, 2015) ("In applying [20 C.F.R. § 416.920b(c)], . . . when the information needed pertains to the treating physician's opinion, the ALJ should reach out to that treating source for clarification and additional evidence."); *Gabrielsen*, 2015 WL 4597548, at *6 ("[C]ourts in the Second Circuit have concluded, citing [40 C.F.R. §§ 404.1520b(c)(1), 16.920b(c)(1)], that the ALJ still has an obligation to re-contact the treating physician in some cases." (citing *Selian*, 708 F.3d at 42, and *Ashley v. Comm'r of Soc. Sec.*, No. 14-CV-40, 2014 WL 7409594, at *4 (N.D.N.Y. Dec. 30, 2014))); *see also Vazquez v. Comm'r of Soc. Sec.*, No. 14-CV-6900, 2015 WL 4562978, at *17 (S.D.N.Y. July 21, 2015) ("[T]he alteration of the regulations does not give the ALJ free rein to dismiss an inconsistency without further developing the record."); *Ashley*, 2014 WL 7409594, at *4 (finding that, despite having broad discretion to resolve conflicts, the ALJ should have contacted and sought clarification from the treating doctor instead of finding that "[i]t was not necessary to contact either [doctor to] clarify their opinions as their treating records lack the documentation that they could point to [] support their opinions" (citing 40 C.F.R. §§ 404.1520b(c)(1), 16.920b(c)(1))); *Jimenez v. Astrue*, No. 12-CV-3477, 2013 WL 4400533, at *11 (S.D.N.Y. Aug. 14, 2013) (noting that despite the

2013 amendments, "the regulations still contemplate the ALJ recontacting treating physicians when 'the additional information needed is directly related to that source's medical opinion'" (quoting How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10,651–01, 10,652 (Feb. 23, 2012))).

Failing to adequately develop the record is an independent ground for vacating the ALJ's decision and remanding for further findings. *See Rosa*, 168 F.3d at 83 (finding remand "particularly appropriate" where the ALJ failed to obtain adequate information from treating physicians and potentially relevant information from other doctors); *Green v. Astrue*, No. 08-CV-8435, 2012 WL 1414294, at *14 (S.D.N.Y. Apr. 24, 2012) ("[F]ailure to develop the record adequately is an independent ground for vacating the ALJ's decision and remanding the case." (citing *Moran v. Astrue*, 569 F.3d 108, 114–15 (2d Cir. 2009))), *report and recommendation adopted*, No. 08-CV-8435, 2012 WL 3069570 (S.D.N.Y. July 26, 2012). However, even where an ALJ fails to develop the opinions of a treating physician, remand may not be required "where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's [RFC]." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013).

For the reasons discussed below, the Court finds that the ALJ (1) failed to adequately explain his reasons for affording little weight to the medical opinion of Plaintiff's treating physician Dr. Zavelyuk, thereby violating the treating physician rule and also failed to develop the record with respect to Dr. Zavelyuk's medical opinion and (2) failed to adequately explain his reasons for affording only moderate weight to the medical opinion of Plaintiff's treating physician Dr. Kreizman and also failed to develop the record with respect to Dr. Kreizman's medical opinion.

### 1. The ALJ did not properly address Dr. Zavelyuk's findings and failed to develop the record

The ALJ accorded "little weight" to Dr. Zavelyuk's opinion contained in her February 6, 2012 and February 28, 2012 questionnaires. (R. 29–30.) In the February 6, 2012 questionnaire, Dr. Zavelyuk noted that Plaintiff was only able to lift up to five pounds at a time; that Plaintiff could only sit, stand, or walk for up to one hour of each eight-hour work day; that Plaintiff would need to take an hour break every few hours; and that Plaintiff was unable to push, pull, kneel or bend. (R. 29–30.) Dr. Zavelyuk diagnosed Plaintiff with disc herniation and impingement of the thecal sac and concluded that her condition might improve within six months with medical treatment. (R. 189.) Dr. Zavelyuk identified clinical findings of severe back pain radiating to the right leg, numbness, and limping and identified back pain in the lumbar area and numbness as Plaintiff's primary symptoms. (R. 189–90.) She cited an MRI in support of her findings and diagnosis, which showed herniation at L4-L5 and impingement of the thecal sac. (R. 190.) The doctor opined that Plaintiff's symptoms would increase if she worked, that the pain would periodically interfere with Plaintiff's concentration, and that Plaintiff could be absent from work more than three times a month as a result of her impairment. (R. 193–95.)

In the February 28, 2012 questionnaire, Dr. Zavelyuk noted Plaintiff's diagnosis as right side disc herniation with impingement of the thecal sac, and stated that she expected Plaintiff's condition to last for six months. (R. 177–78.) Dr. Zavelyuk reported clinical findings underpinning her diagnosis of muscle spasms in the lower back and sciatic pain, and identified that diagnostic testing included the MRI taken on December 8, 2011. (R. 178–79.) Dr. Zavelyuk reported that, while Plaintiff had previously had a waddling gait, that was no longer the case. (R. 180.) She stated that Plaintiff could flex her lumbar spine to 40 degrees, out of 90, and lateral flex to the right to 20 degrees, out of 25. (R. 187.) Dr. Zavelyuk opined that Plaintiff

could lift and carry only two pounds and that her standing and walking were limited to two hours. (R. 184.) She reported Plaintiff's sitting was limited, but did not specify a time duration. (R. 184.)

The ALJ assigned little weight to the entirety of Dr. Zavelyuk's opinions, finding that Dr. Zavelyuk failed to "demonstrate what specific clinical findings or objective medical tests supported her conclusions" and that her treatment record contained no clinical findings that supported her conclusions. (R. 30.) The ALJ further stated that it appeared Dr. Zavelyuk only provided Plaintiff with primary care treatment. (R. 29.)

In reaching his conclusion to assign little weight to Dr. Zavelyuk's opinion, the ALJ did not address the clinical testing evidence consistent with Dr. Zavelyuk's opinions. When Dr. Zavelyuk completed both questionnaires, Plaintiff had undergone an MRI as a result of Dr. Zavelyuk's referral, which revealed posterolateral disc herniation at L4-L5, impinging upon the thecal sac; posterolateral disc herniation at L5-S1, impinging upon the thecal sac; and straightening of the normal curvature of the lumbosacral spine. (R. 212–213.) Despite the fact that Dr. Zavelyuk referenced the MRI results, the ALJ never evaluated Dr. Zavelyuk's reliance on the MRI in reaching his conclusion that the doctor did not demonstrate that any objective medical tests supported her conclusions. (R. 30.) In addition, as explained in more detail below, the PARS records of Dr. Kreizman's treatment of Plaintiff reflect similar clinical findings to those described by Dr. Zavelyuk, including the findings that Plaintiff experienced radiating sciatic back pain, that Plaintiff's ability to sit and stand was limited, and that even sedentary work could exacerbate Plaintiff's condition. (*See* R. 215, 234, 240, 271.) In concluding that Dr. Zavelyuk's opinions lacked objective support, the ALJ failed to address these corroborating facts. (R. 228–30.) Because the ALJ ignored Dr. Zavelyuk's reliance on the MRI results and

other evidence corroborating her opinions, the ALJ failed to provide good reasons to accord Dr. Zavelyuk's opinion little weight. This failure violates the treating physician rule, and warrants remand.

The ALJ also failed to properly develop the record before assigning reduced weight to the opinion of Dr. Zavelyuk. The ALJ correctly acknowledged that Dr. Zavelyuk's opinion reflected that Plaintiff was "severely restricted by her conditions" and recounted Dr. Zavelyuk's specific findings regarding Plaintiff's functionality. (R. 29–30.) However, the ALJ indicated that Dr. Zavelyuk's treatment record "did not include any clinical findings assessing functional restrictions" for Plaintiff and assigned the opinion "little weight" because "her medical record did not include any clinical findings supporting her opinion." (R. 29–30.)

In rejecting Dr. Zavelyuk's opinion for lack of supportive clinical findings and documentary support, the ALJ ignored his affirmative duty to develop the record. The ALJ was aware of Dr. Zavelyuk's diagnosis and of her statements of supporting clinical findings in the questionnaires, but found that he could not assign the opinion controlling weight because of a gap in the record — the lack of notes or supporting reports. (R. 30.) Having specifically identified a relevant gap in the record, "the ALJ committed legal error in failing [to] develop the record or seek clarification of the treating physicians' assessments before dismissing them as inadequately supported by the clinical findings." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 278 (S.D.N.Y. 2010); *see also Perez*, 77 F.3d at 47 ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record.").

The best course of action would have been to follow up with Dr. Zavelyuk and to attempt to gather her supporting documentation or to obtain explanations for her findings. The record

available to the ALJ clearly showed that Dr. Zavelyuk's questionnaires followed at least three in-person examinations of Plaintiff and were based on an MRI of Plaintiff's lower back.[12]  (R. 177, 189.)  Because the ALJ was unclear as to how Dr. Zavelyuk reached her opinion, "the information needed pertain[ed] to the treating physician's opinion, [and] the ALJ should [have] reach[ed] out to that treating source for clarification and additional evidence."  *McClinton*, 2015 WL 5157029, at *23.  His failure to do so before assigning her opinion "little weight" was error and warrants remand.  *Selian*, 708 F.3d at 421; *Jimenez*, 2013 WL 4400533, at *11.

## 2.   The ALJ did not properly address Dr. Kreizman's findings and failed to develop the record

The ALJ accorded "some weight" to the opinion of Dr. Kreizman, who diagnosed Plaintiff with severe "low back" pain, lumbar radiculopathy, a gait disorder, disc herniations, and straightening of the lumbosacral spine.  (R. 30.)  In his March 7, 2013 letter, Dr. Kreizman stated that Plaintiff had difficulty walking, standing, and sitting for long periods and described Plaintiff as having decreased muscle strength, range of motion, and limitations in activities of daily living.  (R. 215.)  Dr. Kreizman had been treating Plaintiff with physical therapy and regular injections, and Plaintiff had been unable to work for the prior twelve months due to the pain.  (R. 215.)  He opined that Plaintiff was unable to perform any type of physical work activity or work for the next twelve months, as it could worsen her condition.  (R. 215.)  Dr. Kreizman's opinion came after numerous appointments at PARS, where Plaintiff was seen by both Dr. Kreizman and physical therapists.  (R. 228–36, 238–42, 270–72.)  Nevertheless, the ALJ discounted Dr. Kreizman opinion and assigned it only "some" weight, finding that the doctor "did not quantify

---

[12]  Dr. Zavelyuk stated that she began treating Plaintiff on December 5, 2011, and provided the referral for the MRI, yet the record is devoid of notes evidencing an examination on this date.  Dr. Zavelyuk also stated in the February 28, 2012 questionnaire that she last examined Plaintiff on February 4, 2012, but the record reflects no notes of this examination.  (R. 177.)

specific functional restrictions for [Plaintiff's] capacity to sit, stand, or walk due to her medical conditions." (R. 30.)

In assigning Dr. Kreizman's opinion reduced weight, the ALJ appears to have implicitly considered ways in which Dr. Kreizman's opinion was not supported by the objective medical evidence and testimony, but the ALJ erroneously failed to acknowledge the ways in which Dr. Kreizman's opinion *was* consistent with the objective medical evidence. *See Johnston v. Colvin*, No. 13-CV-00073, 2014 WL 1304715, at *3 (D. Conn. Mar. 31, 2014) ("In reasoning that [the treating physician's] opinion merited 'little weight,' the ALJ recounted only those aspects of the opinion that were inconsistent with the weight of the objective medical evidence, . . . [but] neglected to acknowledge objective medical evidence in the record that did support Dr. Schwarz's opinion. Failing to do so necessarily means that the ALJ's analysis of how much weight to ascribe to Dr. Schwarz's opinion was lacking."); *Larsen v. Astrue*, No. 12-CV-00414, 2013 WL 3759781, at *2 (E.D.N.Y. July 15, 2013) ("[A]lthough the ALJ did mention evidence in the record that corroborated aspects of [the treating physician's] findings and ultimate conclusions, . . . the ALJ did not elaborate on how this evidence affected the weight accorded to [the treating physician's] opinions.").

The ALJ emphasized that the treatment record demonstrated that Plaintiff had "improved with regular physical therapy and pain management that included epidural steroid injections" and that Dr. Kreizman's notes from September 6, 2012, March 5, 2012, and March 28, 2013 each indicated that Plaintiff's back pain had decreased. (R. 30.) However, the ALJ did not address the portion of the record indicating that, at a September 11, 2012 appointment, Dr. Kreizman noted that Plaintiff had difficulty walking and lying down and continued to present with "low back" pain at a seven on a scale of ten and intermittently radiating into the legs, weakness, loss

of range of motion, leg numbness. (R. 224, 27.) On March 5, 2013, Dr. Kreizman noted that

Plaintiff had difficulty walking due to back pain and reported ongoing "low back" pain, at an

eight on a scale of ten. (R. 220.) Dr. Kreizman's examination of Plaintiff revealed positive

sacroiliac joint tenderness, decreased lumbar range of motion, and an antalgic gait. (R. 222.)

The ALJ also failed to consider whether Dr. Kreizman's opinion was consistent with, or

informed by, the lumbar MRI performed on Plaintiff on March 5, 2013, which showed a

moderate broad-based disc herniation at L4-L5 and a mild disc herniation at L5-S1. (R. 277.)

By ignoring evidence corroborating Dr. Kreizman's opinion and selectively focusing on facts to

conclude that Dr. Kreizman's opinion lacked support, the ALJ failed to provide good reasons for

according Dr. Kreizman's opinion reduced weight. This failure violates the treating physician

rule, and warrants remand.

Moreover, the ALJ also failed to properly develop the record before assigning reduced

weight to the opinion of Dr. Kreizman. The ALJ recounted that Dr. Kreizman's opinion stated

that Plaintiff had difficulty standing, sitting, and walking for extended periods. (R. 30.)

However, the ALJ indicated that Dr. Kreizman "did not quantify specific limitations or

functional restrictions due to the diagnosed conditions" and thus assigned the opinion only

"some weight." (R. 30.) In order to satisfy his threshold duty to develop the record, the ALJ had

an obligation to fill the gap that he had identified in the administrative record before assigning

Dr. Kreizman's opinion diminished weight for its lack of quantified limitations. *Burgess*, 537

F.3d at 129 ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to

fill any clear gaps in the administrative record."). The ALJ was aware that Dr. Kreizman had

examined Plaintiff on numerous occasions, prescribed and oversaw her physical therapy, and

treated her with steroid injections. (R. 228–36, 238–42, 270–72.) However, having identified a

relevant gap in the record, "the ALJ committed legal error in failing [to] develop the record or seek clarification of the treating physicians' assessments before dismissing them as inadequately supported by the clinical findings." *Calzada*, 753 F. Supp. 2d at 278.

Because the ALJ was unclear as to Dr. Kreizman's assessment, "the information needed pertain[ed] to the treating physician's opinion, [and] the ALJ should [have] reach[ed] out to that treating source for clarification and additional evidence." *McClinton*, 2015 WL 5157029, at *23. The ALJ should have followed up with Dr. Kreizman about any quantified findings as to Plaintiff's functional restrictions in her capacity to sit, stand, or walk due to her medical conditions. His failure to do so before assigning the opinion only "some weight" was error. *Selian*, 708 F.3d at 421; *Jimenez*, 2013 WL 4400533, at *11.

### ii. The Court cannot further assess whether the RFC assessment is supported by substantial evidence or whether the ALJ properly assessed Plaintiff's credibility

Plaintiff argues that the ALJ lacked substantial evidence to support a finding that Plaintiff retained the capacity for sedentary work. (Pl. Mem. 7–11.) Plaintiff further argues that the ALJ improperly relied on the opinion of consulting physician, Dr. Shtock, whose report stated that Plaintiff could perform the fill range of sedentary work, while simultaneously stating that Plaintiff had a moderate limitation for sitting, without quantifying the limitation. (*Id*. at 11.) The Commissioner argues that the ALJ's finding was supported by substantial evidence, and that it was appropriate for the ALJ to afford the opinion of Dr. Shtock great weight because the doctor's findings based on his examination were consistent with his opinion that Plaintiff could perform the full range of sedentary work. (Comm'r Reply 19–20.)

In determining the RFC of a claimant, "[t]he Commissioner must consider objective medical evidence, opinions of examining or treating physicians, subjective evidence submitted

by the claimant, as well as the claimant's background, such as age, education, or work history."
*Stover v. Astrue*, No. 11-CV-172, 2012 WL 2377090, at *6 (S.D.N.Y. Mar. 16, 2012) (citing
*Mongeur*, 722 F.2d at 1037). A RFC determination specifies the "most [a claimant] can still do
despite [the claimant's] limitations." 20 C.F.R. § 404.1545. With respect to a claimant's
physical abilities, a RFC determination indicates the "nature and extent" of a claimant's physical
limitations and capacity for work activity on a regular and continuing basis. *Id.* § 404.1545(b).
For example, "a limited ability to perform certain physical demands of work activity, such as
sitting, standing, walking, lifting, carrying, pushing, pulling or other physical functions
(including manipulative or postural functions, such as reaching, handling, stooping or
crouching), may reduce [a claimant's] ability to do past work and other work." *Id.* "Because an
RFC determination is a medical determination, an ALJ who makes an RFC determination in the
absence of supporting expert medical opinion has improperly substituted his own opinion for that
of a physician, and has committed legal error." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d
330, 347 (E.D.N.Y. 2010) (citing *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000)
and *Zorilla v. Chater*, 915 F. Supp. 662, 666–67 (S.D.N.Y. 1996)).

The SSA regulations direct consulting examiners to include information relevant to the
RFC determination. *See* 20 C.F.R. § 416.919n (detailing the elements of a complete consultative
examination report). Specifically, among the relevant information required for a consultative
report is "[a] statement about what [the claimant] can still do despite [his or her] impairment(s)."
20 C.F.R. § 416.919n(c)(6). The regulations note that the SSA will "ordinarily request . . . a
medical source statement about what you can still do despite your impairment(s)." *Id.* However,
the regulations further state that "the absence of such a statement in a consultative examination
report will not make the report incomplete." *Id.* Indeed, "[t]aken more broadly, [these

regulations] suggest remand is not always required when an ALJ fails in his duty to request opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's [RFC]." *Tankisi*, 521 F. App'x at 34 (citing SSA regulations expressly stating that the record may still be complete without a medical source opinion).

However, while an ALJ may, in some circumstances, proceed without a medical source opinion as to the claimant's functional limitation, there must still be "sufficient evidence" for the ALJ to properly make the RFC determination. *See Sanchez v. Colvin*, No. 13-CV-6303, 2015 WL 736102, at *6 (S.D.N.Y. Feb. 20, 2015) ("Significantly, the administrative record here is a far cry from that in *Tankisi* and similar cases, which have excused the ALJ's failure to seek a treating physician's opinion based on the completeness and comprehensiveness of the record."); *Downes v. Colvin*, No. 14-CV-7147, 2015 WL 4481088, at *15 (S.D.N.Y. July 22, 2015) (noting that unlike *Tankisi*, "the treatment notes and test results from [the plaintiff's] treating physicians do not assess how [the plaintiff's] symptoms limited his functional capacities" and remanding for further findings); *cf. Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) ("*Given the extensive medical record* before the ALJ in this case, we hold that there were no 'obvious gaps' that necessitate remand solely on the ground that the ALJ failed to obtain a formal opinion from [the] treating physicians . . . ." (emphasis added)); *Tankisi*, 521 F. App'x at 34 (emphasizing the "extensive record" available to the ALJ).

Where, as here, an ALJ fails to adequately develop the record in reaching a conclusion as to a claimant's residual functional capacity, the Court is unable to review whether the ALJ's denial of benefits was based on substantial evidence. *Mantovani v. Astrue*, No. 09-CV-3957, 2011 WL 1304148, at *4 (E.D.N.Y. Mar 31, 2011) (Where the ALJ fails to develop the record, "the Court need not — indeed, cannot — reach the question of whether the [ALJ's] denial of

benefits was based on substantial evidence." (alteration in original)).  Instead, where the ALJ has failed to fully develop the factual record, the proper remedy is to remand the case for further proceedings.  *See Butts*, 388 F.3d at 386; *Mantovani*, 2011 WL 1304148, at *4.

Similarly, Plaintiff argues that the ALJ erred in finding that she was not credible as to the intensity, persistence and limiting effects of her impairment because the ALJ improperly weighed whether Plaintiff's testimony was consistent with the medical evidence in the record. (Pl. Mem. 12–14.)  Because the Court remands the case for further development of the medical evidence, the Court will not address Plaintiff's remaining arguments, as the ALJ's errors impact the Court's ability to review the credibility determinations.

## III.  Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied and Plaintiff's cross-motion for judgment on the pleadings is granted.  The Commissioner's decision is vacated, and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).  The Clerk of Court is directed to close this case.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: February16, 2016
       Brooklyn, New York